Vincent F. Papalia
Mark A. Roney
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932-2226
(973) 622-3333
Proposed Attorneys for Eagle Recycling Systems, Inc.
and Lieze Associates, d/b/a Eagle Recycling of NJ

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>EAGLE RECYCLING SYSTEMS, INC. *et al*.,[1]<br><br>    Debtors and Debtors-in-Possession. | Chapter 11<br><br>Case Nos. 13-18412 and 13-18413 |

**DECLARATION OF JEFFREY MARANGI IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY ORDERS**

JEFFREY MARANGI, pursuant to 28 U.S.C. §1746, declares as follows:

1.  I am the duly authorized agent of Eagle Recycling Systems, Inc., a Florida corporation ("Eagle Recycling"), and its wholly-owned subsidiary, Lieze Associates, Inc. d/b/a Eagle Recycling of NJ ("Lieze"). Eagle Recycling and Lieze are collectively referred to as "Eagle" or the "Debtors."

2.  All the shares of Eagle Recycling are held in the Estate of Nicholas F. Marangi, deceased, which estate is currently being administered in the Probate Court of Palm Beach County in Florida. Nicholas F. Marangi, who died in 2010, was my father and I am a personal representative of his estate. I am authorized to submit this Declaration on behalf of the Debtors in my capacity as a personal representative of my father's estate.

3.  This Declaration is submitted to provide general information about the Debtor, its

---

[1]The proposed jointly administered Chapter 11 Debtor is Lieze Associates, Inc., d/b/a Eagle Recycling of NJ.

business and property, explain the circumstances leading up to the Debtors' Chapter 11 filing, and to support the "First Day" Motions that are being filed with this Declaration.  The factual statements in this Declaration are based on my personal knowledge and information available to me from the Debtors' books and records and employees.

## BACKGROUND

### A.    The Chapter 11 Filings and the First Day Motions

4.    On the date of this Declaration, each of the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey.

5.    The Debtors continue to manage their properties and business as debtors-in-possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

6.    Additionally, Marangi Family L.P. ("MFLP"), a Florida limited partnership and a guarantor of Eagle Recycling's obligations to Comerica Bank ("Comerica"), is currently a debtor and debtor-in-possession in Chapter 11 proceedings pending in the United States Bankruptcy Court for the Southern District of Florida (Greater Palm Beach Division), Case No. 13-12473-EPK.[2]  It is contemplated that MFLP will shortly be filing an application to transfer venue of its Chapter 11 case to this Court, and that the Debtors will request that the MFLP case be jointly administered with these cases.

7.    In connection with these bankruptcy filings, the Debtors are requesting that this Court consider, on an expedited basis, the following five (5) "first day" motions (the "First Day Motions"):  (i) Motion for an Order Granting the Debtors' Interim and Final Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363 and 364 and Federal Rule of Bankruptcy Procedure 4001 (the "Cash Collateral Motion"); (ii) Motion for an Order Authorizing, But Not Directing, the

---

[2] My father Nicholas F. Marangi,  was the sole shareholder of NM Family, Inc., the general partner of MFLP.

Debtor to Pay Pre-Petition Wages, Salaries, Taxes and Other Compensation (the "Wages Motion"); (iii) Motion for an Order Authorizing the Debtors to Continue to Maintain their Existing Bank Accounts, Cash Management System and Business Forms; (iv) Motion for an Order Granting the Debtor an Extension of Time Within Which to File the Schedules of Assets and Liabilities and Statement of Financial. Affairs (the "Motion to Extend Time to File Statements and Schedules"); and (v) Motion for Order Directing Joint Administration of These Cases.

8.     The purposes of the First Day Motions are to, among other things: (a) assist the Debtors in continuing to operate in the ordinary course of business; (b) ease the Debtors' transition into Chapter 11; (c) allow for the efficient and orderly administration of these cases; and (d) provide the Debtors with a "breathing spell" from aggressive creditor action while the Debtors formulate and propose a strategy and plan designed to maximize recoveries for the estate, creditors and other stakeholders.

**B.     The Debtors' Business and Property**

9.     Eagle Recycling is a Florida corporation and has its principal place of business at 4711 Dell Avenue, North Bergen, New Jersey.

10.     Lieze is a New Jersey corporation having its principal place of business at the same address.  Lieze does business as Eagle Recycling of NJ or Eagle Recycling of New Jersey.  As noted above, all the shares of Eagle are held by the Estate of Nicholas F. Marangi and Eagle owns all the shares of Lieze.

**1.     The MRF**

11.     Eagle Recycling is the owner of the land and buildings located at 4711 Dell Avenue, North Bergen, New Jersey (Block 91, Lot 1, Block 93, Lot 1.01, Block 95, Lot 1, Block

100, Lot 24 on the Tax Map of the Township of North Bergen) (the "Property").

12.    The Property consists of four non-contiguous lots (all on or adjacent to Dell Avenue) with a total of approximately 3.8 acres.  The principal improvements on the Property are a 33,025 square foot Solid Waste Transfer and Materials Recovery Facility (the "MRF"), a 3,136 square foot two story office, weigh station and storage building, and a maintenance garage.

13.    The MRF is a solid waste and materials recovery facility licensed to handle primarily construction and demolition waste (Type 13C) and bulky waste (Type 13), as well as non-putrescible municipal waste (Type 10), vegetative waste (Type 23), and dry industrial waste (Type 27).

14.    Lieze is the holder of a Solid Waste Facility Permit No. TRP080001 (the "Permit") issued by the New Jersey Department of Environmental Protection (the "DEP"), which allows the Debtors to conduct solid waste and materials recovery operations at the MRF for acceptance, processing and transfer of the materials described above.  The Permit allows the Debtors to process up to 1,000 tons per day and 6,000 tons of permitted materials per week.  Lieze also holds a Certificate of Public Convenience and Necessity from the DEP which permits the MRF to accept these waste types from vehicles owned or operated by entities other than the Debtors.

15.    The MRF benefits from its location in a heavily populated and industrialized area of Northern New Jersey, just 2.8 miles from the Lincoln Tunnel and New York City.

16.    Eagle Recycling acquired the Property and MRF and certain related equipment in March 2004 following a bankruptcy court action and sale in the Chapter 11 case of *In re H.C. Co., Inc., et al.* (Case No. 03-46330) that was pending before this Court.

2.      **The Debtors' Employees**

17.      The Debtors have approximately 38 full time employees, all of whom work at the MRF.  I am not employed by and receive no salary or other benefits from Eagle, although I am authorized to use the company credit card for business purposes.

18.      My sister is employed by the Debtors as a bookkeeper, at an annual salary of approximately $25,000.

3.      **Summary Financial Information**

19.      According to the Debtors' books and records, the Debtors' combined unaudited revenues for the year ended December 31, 2012 were $10,362,000, which resulted in a net loss of $1,784,000 for that year.  The unaudited book value of the Debtors' assets and liabilities were $10,470,000 and $13,608,000, respectively as of December 31, 2012.

20.      For the first two months of 2013, the Debtors' operations have improved, with total revenues of $1,706,532, and net operating income of $67,751.  Additionally, although the Debtors' books are not yet closed for March, the Debtors anticipate that the last month will show further improved results.

C.      **My Involvement With the Debtors**

21.      As noted above, I am a personal representative of my father's estate and have been operating the Debtors' business in that capacity.  Under my father's Last Will and Testament (the "Will"), my brother and I are given the right to purchase from the Nicholas Marangi estate (or any trust thereunder) the stock of Eagle Recycling at a purchase price to be determined in accordance with the terms of the Will.  Neither my brother nor I have exercised that right, nor do we have any current intention of doing so.

22.      Prior to my father's passing, neither of us was employed by or otherwise affiliated

with the Debtors.[3]  I assumed my responsibilities as to the Debtors only after my father's passing

and as a personal representative of my father's estate.  My brother has no role in either company.

Since my father's passing, I have been using my best efforts to address the many difficult issues

facing the Debtors, as described in more detail below.

**D.**    **The Debtors' Pre-Petition Debt Structure**

23.    On or about December 16, 2005, Eagle Recycling entered into a Credit Agreement

(as amended, the "Credit Agreement") with Comerica pursuant to which Comerica agreed to

make certain loans and extension of credit to Eagle Recycling.  The Credit Agreement was

amended on multiple occasions.  Copies of the Credit Agreement and the most recent

Forbearance Agreement are attached as Exhibits A and B, respectively to the Debtors'

Application in Support of the Use of Cash Collateral.

24.    On or about December 16, 2005, pursuant to the Credit Agreement, Eagle

Recycling executed and delivered to Comerica a Revolving Note in the original principal amount

of $200,000 (the "Revolving Note").

25.    On or about March 7, 2006, Comerica issued an irrevocable Letter of Credit in the

amount of $8,540,244.93 (the "Letter of Credit") authorizing Eagle Recycling to draw on

Comerica for payment of interest, principal, and the purchase price with respect to New Jersey

Economic Development Authority Economic Development Bonds (Stamato Realty, LLC - 2001

Project) (the "Bonds").  The Letter of Credit was extended from time to time.

26.    On or about June 9, 2008, pursuant to the Credit Agreement, Eagle Recycling

executed and delivered to Comerica an Amended and Restated Term Note in the original

principal amount of $1,100,000 (the "Term Note"), which included an amount previously

---

[3]M-Land, Inc., an entity that is equally owned by my brother Brian and me, leases an adjacent property which
contains rail track and other improvements that  provide rail access to the Debtors.  See, paragraphs 36-70 infra.

advanced to Eagle under the Credit Agreement.

27.    On or about April 30, 2011, pursuant to the Credit Agreement, Eagle Recycling executed and delivered to Comerica a Promissory Note in the original principal amount of $164,763.66.

28.    The Comerica Credit Agreement is secured by: (i) a first mortgage (the "Comerica Mortgage") on the Property; (ii) a security agreement, UCC-1 financing statements extending to substantially all Eagle Recycling's assets, including accounts, inventory, equipment and general intangibles; and (iii) a Pledge Agreement, pursuant to which Nicholas Marangi pledged all his stock in Eagle Recycling to Comerica.

29.    The Credit Agreement was also guaranteed by Nicholas F. Marangi (the "Marangi Guaranty") and by MFLP (the "MFLP Guaranty").  As was noted above, MFLP is a Debtor in Chapter 11 proceedings pending in the Southern District of Florida (the "Florida Bankruptcy Case").  The MFLP Guaranty is secured by a Security Agreement and Control Agreement with respect to a securities account maintained by MFLP at UBS Financial Services, Inc. ("UBS").

30.    On information and belief, the MRF and related real property and equipment have a combined going concern value of approximately $6-7 million.[4]  The book values of the Debtor's accounts receivable and equipment are approximately $1,018,000 (less an allowance for doubtful accounts of $80,360) and $2,873,352 (less accumulated depreciation of $2,193,950), respectively, as of February 28, 2013.    Additionally, Comerica's debt is secured by the Guarantee of MFLP and the securities account at UBS with a value of more than $2.5 million. Thus, on information and belief, Comerica's total indebtedness of approximately $6.1 million is

---

[4]A recent real estate appraisal of the Property on which the MRF is located, conducted on behalf of Comerica, indicates that the Property has a "stand alone" market value of $4.9 million as of January 22, 2013, without regard to the MRF operations or the going concern value of the Debtors' business.  The Debtors believe this appraisal undervalues the Property.  Further, the appraisal expressly assigns no value to the Debtors' business, including the MRF, or equipment.

substantially oversecured.

**E.    The Asserted Defaults Under the Comerica Credit Agreement**

31.    Comerica has asserted that Eagle Recycling is in default under the Credit Agreement for failing to pay when due the amounts thereunder, allowing its operating account to be overdrawn, and allowing a draw on the letter of Credit on February 1, 2013 in the amount of $5,395,314.73.    As a result, Comerica has advised that it accelerated all indebtedness under the Credit Agreement, which Comerica asserts consists of the following principal and interest as of April 17, 2013:

| NOTE/OBLIGATION | PRINCIPAL | INTEREST | TOTAL |
|---|---|---|---|
| Revolving Note | $189,938.71 | $760.12 | $190,698.83 |
| Term Note | $484,523.72 | $1,953.73 | $486,477.45 |
| Installment Note | $114,419.08 | $459.99 | $114,879.07 |
| Reimbursement Obligation (for Bonds) | $5,308,948.16 | $24,308.93 | $5,333,256.88 |
| **Total** | **$6,097,829.67** | **$27,482.77** | **$6,125,312.23** |

32.    There is little interest due on the Comerica Obligations (which Comerica assets is accruing at the Default Rate thereunder) because Eagle has continued to make, and Comerica has accepted, various payments of principal and interest from Eagle Recycling after the asserted defaults and Comerica recently swept hundreds of thousands of dollars from Eagle's account.

33.    The Debtors have no other line of credit or working capital and financing facilities and have not been able to obtain any alternative financing, despite significant efforts to do so.

34.    Continuing efforts to enter into a workout or forbearance agreement with Comerica pre-petition have not been successful.

35.    As of March 31, 2013, the Debtor also had unsecured liquidated debts totaling approximately $3.6 million, loans payable to the estate of Nicholas Marangi in excess of $2.6 million and significant unliquidated and/or disputed other liabilities, as explained in more detail

below.  The liquidated unsecured debt includes (among other things) trade payables, utilities, professional fees and other business-related expenses.

**F.      Related Party Transaction**

36.    Eagle Recycling of NJ and M-Land, Inc. ("M-Land") are parties to a Lease Agreement (the "M-Land Lease") dated October 1, 2010 with respect to the rail facility located at 4801 Dell Avenue, North Bergen.  The M-Land Lease calls for a monthly rent of $15,000 through September 2013, although M-Land informally agreed to temporarily reduce this amount to $14,000 per month.

37.    M-Land is equally owned (50-50) by my brother and me.

38.    The M-Land Lease is essential to the Debtors continuing operations as it provides a cost-effective way to transport waste and recyclables. Rail cars go through M-Land's property into and out of Eagle.  The waste and certain recyclables are placed into the rail cars for transport to landfills or other facilities in other states.  Without the access provided by the M-Land Lease, Eagle would be required to use trucks for transportation to the landfills or other facilities at a much higher cost.

39.    I believe the rent under the M-Land Lease is at a market or below market rate, particularly as temporarily reduced to $14,000 per month.

40.    Additionally, the Debtors and M-Land effectively "share" two hourly employees who perform work related to the MRF.  These two employees are paid by M-Land and their salaries and benefits are reimbursed to M-Land by Eagle.

**G.      Events Leading to the Chapter 11 Filing**

41.    Despite the success of the Debtors' recent efforts to increase revenue, decrease costs and improve profitability, the Debtors have been unable to enter into a new or extended

financing arrangement or forbearance with Comerica.  As noted, Comerica has declared Eagle Recycling to be in default and is taking various actions to enforce its rights against Eagle Recycling and its guarantor, MFLP.  Most recently, on or about April 5-8, 2013, Comerica:  (i) swept approximately $250,000 from the Debtors' Comerica operating account and (ii) moved for relief from stay in the Florida Bankruptcy Case to liquidate the approximately $2.5 million held in the UBS account owned by MFLP.  Comerica has also indicated it would notify account debtors to pay Comerica and take other actions that I believe are detrimental to the Debtors' estates and the interests of its other stakeholders.

42.    The Debtors' inability to extend its credit facility with Comerica, Comerica's recent enforcement actions, and the problems caused by the criminal and environmental enforcement proceedings, which are based upon events occurring prior to my father's death in December 2010, as described below, have left the Debtors with no alternative but to file these petitions and seek to reorganize, most likely through the sale and liquidation of their assets.

43.    In this connection, the Debtors have been in discussions and negotiations with various potential bidders for all or substantially all the Debtors' assets, including the Property, the MRF an their other assets.  Accordingly, the Debtors anticipate that in the relatively near future, they will be requesting that the Court approve bidding procedures and grant related relief in connection with a prospective sale of all or substantially all of its assets, either with or without a stalking horse bidder.

44.    In addition to their recent inability to extend their credit facilities with Comerica, the Debtors have faced various operational and other difficulties that give rise to the need for those filings, including: (i) a criminal investigation that resulted in Lieze pleading guilty to certain charges relating to illegal dumping at a landfill in Frankfort, New York (the "Frankfort

Site"); (ii) various environmental clean-up responsibilities resulting from the activities described above and other matters; (iii) the DEP's requirement that the Debtors upgrade to obtain the required Air Permit at a cost the Debtors estimate to be approximately $1 million; and (iv) the substantial legal and other costs relating to these various proceedings and the attention required of new management to deal with these issues, as described in more detail below.

### 1.    The Frankfort Site Issues

45.    The DOJ conducted an extensive investigation into alleged illegal dumping by the Debtors and other parties at a landfill located at the Frankfort Site in upstate New York. The investigation began in 2006 and continued until 2011. The Debtors were required to retain counsel to assist and defend them in the investigation, which also diverted substantial amounts of management's time and attention from operating the business. To make matters more difficult, Mr. Nicholas Marangi died in 2010 while the investigation was ongoing.

46.    The investigation and related negotiations culminated in a plea agreement by which Lieze pled guilty in April 2011 to conspiring to violate the Clean Water Act, among other things.[5] As part of the plea agreement, Lieze agreed to pay a fine of $500,000 (which has been paid), to develop (in coordination with and with the final approval of the EPA and Department of Justice) and implement an environmental compliance plan ("ECP") and pay restitution that includes potential clean-up costs at the Frankfort Site. After extensive negotiations, with the involvement of environmental consultants on behalf of the Debtors, the ECP has been approved and the cost of compliance with the ECP is estimated at $65,000 per year. The amount of the additional costs is currently unknown, but is potentially substantial.

47.    Additionally, Lieze is subject to an Administrative Order for a Removal Action (the

---

[5] I am advised that the investigation is now concluded and no individual associated with the Debtors plead to or was found guilty of any criminal charges.

"EPA Order") relating to the Frankfort Site, issued by the United States Environmental Protection Agency (the "EPA") to Lieze and others.  The EPA Order indicates that it was issued under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9606(a), and names Lieze (among others) as a Potentially Responsible Party ("PRP") for the clean-up of the Frankfort Site.  The EPA Order also requires the PRPs to pay the EPA's past costs for the removal action the EPA conducted at the Frankfort Site and to undertake with other PRPs a remedial action at the Frankfort Site to dispose of contaminated materials from the site.  This is another potentially substantial cost.

### 2.    Improvements Required for DEP Air Permit

48.    To comply with clean air regulations, the DEP is requiring that the Debtors upgrade their air handling and emissions control equipment at an estimated cost of $1 million.  After over a year of negotiations with the DEP involving engineers retained by Debtors, a draft Air Permit has been prepared and circulated by DEP and signed off on all parties.  Because of Comerica's first lien position, the Debtors are currently unable to obtain financing for this necessary improvement.

### 3.    Other Significant Obligations to Governmental Authorities

49.    Various governmental agencies including North Bergen and its constituent authorities, the Hudson Regional Health Commission, the Hudson County Improvement Authority, the Union County Utilities Authority, the DEP and the State of New Jersey, are asserting substantial claims against the Debtors, many of which are disputed.

### H.    The Debtors' Current Situation

50.    Notwithstanding these significant obstacles and liabilities, the Debtors have put into place various measures, including critical cost reductions, including reductions in staff and

landfill costs, and increased revenue sources, that have brought them from an operating loss of approximately $1.7 million in 2012 to operating profits of approximately $68,000 for the first two months of 2013, with March anticipated to continue that positive trend.  However, Eagle Recycling's inability to extend its credit facilities with Comerica and Comerica's declaration of a default and acceleration, as well as its various actions to realize upon its collateral, combined with the other significant issues and obligations described above, necessitated this Chapter 11 filing.

## I.    The Debtors' Goals in Chapter 11

51.    Although the Debtors believe that a traditional reorganization is a possibility, they recognize that such reorganization faces substantial difficulties and challenges.  As a result, the Debtors have entered into discussions and negotiations with various potential interested parties as to a sale of all or substantially all their assets as a going concern.  Additionally, the Debtors have received several offers for their assets that were not acceptable.

52.    To date, none of those offers or discussions have resulted in a final agreement. Further, in those discussions, all potential interested parties required assurances of a sale free and clear of the various liabilities and obligations described above which the Debtors simply cannot provide outside the bankruptcy context.

53.    As a result, while keeping open the option of a traditional reorganization, the Debtors intend to continue the discussions and negotiations relating to a potential sale of all its assets in the belief that one or more bidders will soon emerge to make a formal proposal and that the Debtors will soon seek this Court's approval of such a sale, subject to higher and better offers.  However, if no acceptable bids are received within a relatively short time frame (90 to 120 days), the Debtors anticipate that they will ask this Court to approve bidding procedures and

grant related relief as to a proposed auction sale.

**J.**       **The First Day Motions**

54.    In the interim, to allow the Debtors to achieve these goals and continue its operations in this Chapter 11 proceeding, the Debtors have filed a number of First Day Motions seeking the use of cash collateral and other relief and request that the Court consider these motions on an expedited basis.  Those motions are described in summary form below.

55.    A summary of the relief sought in each of the First Day Motions is as follows:[6]

**1.**       **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection, (C) Granting Related Relief and (D) Scheduling Final Hearing Thereon (the "Cash Collateral Motion")**

56.    By the Cash Collateral Motion, the Debtor seeks entry of an interim order:

(a)       authorizing the  Borrower's use of the Cash  Collateral (as defined in Section 363(a) of the Bankruptcy Code) of Comerica (as defined in the Financing Motion);

(b)       providing adequate protection to Comerica to the extent set forth herein; and

(c)       vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order.

57.    Prior to the Petition Date, the Debtor and its accountant, CohnReznick, undertook an analysis of the Debtors' projected financing needs during the pendency of this chapter 11 case.  Based on such analysis, the Debtor determined that it could continue to operate solely on the use of "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), at least through July 20, 2013, as set forth in the Budget attached as Exhibit

---

[6] This section is intended to be a summary of the key provisions of the First-Day Motions and the relief sought therein.  The Court and interested parties are respectfully referred to the First-Day Motions for the full details thereof.

C to the Cash Collateral Motion.

58.    The Budget includes monthly interest payments to Comerica and projects that the Debtors will be operating on a positive cash flow basis.  Thus, Comerica's security interest will be more than adequately protected, particularly when the value of the various collateral held by Comerica is considered.  Also, the Debtors have engaged in limited discussions with Comerica regarding pre-petition consensual use of cash collateral and are hopeful that an agreement will be reached in this regard.

59.    Immediate cash collateral use is especially critical for these Debtors because many of their key vendors, such as landfills and fuel suppliers, require immediate payment.  Without the ability to immediately use cash collateral, the Debtors' operations would be crippled, if not forced to shut down.

60.    The Debtors' ability to finance its operations through cash collateral and the availability to the Debtor of sufficient working capital and liquidity is vital to the confidence of the Debtors' employees, vendors, and customers and to the preservation and maintenance of the going-concern value and other values of the Debtors' estate.  Accordingly, the Financing Motion should be approved.

**2.      Debtors' Motion  for an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a) (I) Authorizing, but not Directing, the Debtors To Pay Pre-petition Wages, Salaries and Related Obligations and Taxes and (II) Directing All Banks To Honor Checks and Transfers for Payment of Pre-petition Employee Obligations (the "Wages Motion")**

61.    By the Wages Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) pay all prepetition claims of Employees for wages, salaries, sick pay, personal day pay, vacation pay, holiday pay, and other accrued compensation; (ii) make all payments for which Employee payroll deductions were withheld prepetition; (iii) pay other

miscellaneous Employee-related costs including but not limited to payroll processing costs and fees; and (iv) continue Employee programs with respect to vacation, sick, personal, and holiday leave (collectively, the "Payroll Obligations").

**(a)**      <u>**Wages, Salaries and Other Compensation**</u>

62.   As of the Petition Date, the Debtors employ approximately 38 individuals, including the two M-Land employees whose salaries are reimbursed by the Debtors (collectively, the "Employees").  The Debtors' Employees are all full time and all work at the MRF.

63.   The Debtors' Employees are paid on a weekly basis on Fridays, for the current week.  The Debtors' aggregate average weekly payroll for its Employees, before employee deductions and tax withholdings, is approximately $22,000, plus $3,000 for the two M-Land employees.  The Debtor utilizes a payroll service company, Compupay, to handle administration of their payroll.  The Debtors' most recent payroll in the amount of $22,000 was paid on April 12, 2013 for the weekly period ended on that date.   The Debtors' next payroll, aggregating approximately $25,000, is due to be paid on April 19, 2013 for that week, which is the date these petitions are anticipated to be filed.

64.   In order to minimize the personal hardship the Employees will suffer if the Debtors' prepetition Employee payroll obligations are not paid when due, and to maintain Employee morale during this critical time, the Debtors seek authority to pay all accrued but unpaid prepetition Employee compensation.  The Debtors do not believe that any individual Employee will receive payment in excess of the $11,725 priority claim amount established pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code for accrued but unpaid Employee compensation and related benefits.

(b)    **Payroll Taxes and Other Deductions**

65.    The Debtors are required by law to withhold from Employee paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local taxing authorities.  In addition, the Debtors are required to pay from their own funds Social Security and Medicare taxes, and, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes").

66.    On average, the Debtors remit approximately $3,600 in Payroll Taxes for each weekly payroll period. As of the Petition Date, the Debtors estimate that approximately $3,600 in Payroll Taxes have accrued and remain unpaid.  The Debtors seek authority to pay this amount and to continue to honor and process all prepetition obligations with respect to Payroll Taxes on a post-petition basis in the ordinary course of business, including authority to pay and remit to the appropriate third parties and taxing authorities all Deductions and Payroll Taxes associated with Payroll Obligations, and to continue to pay and remit all such amounts as and when required in the ordinary course of business, regardless of whether such obligations may have accrued prepetition or post petition.

(c)    **Vacation, Sick, Personal and Holiday Leave**

67.    The Debtors maintain an employee benefit policy pursuant to which Employees are provided with certain specific vacation days, sick time and personal days (collectively, the "Benefit Days").  The number of Benefit Days provided generally depends on each Employee's length of service with the Debtors, with some exceptions based on prior employment history and the level of the Employee.

68.    Certain of the Debtors' employees may have accrued and unused Benefit Days as of the Petition Date.    Accordingly, the Debtors seek authority to honor all liabilities to their Employees with respect to Benefit Days that arose prior to the Petition Date and to continue its prepetition policies with respect thereto post-petition in the ordinary course of business.

69.    In sum, the continued and uninterrupted service of the Employees is essential to the Debtors' reorganization efforts.    I believe that the success of the Debtors' Chapter 11 case is dependent upon the continued dedication, goodwill, and support of its employees, and any delay in paying outstanding wages, salaries, other compensation due to the Employees and Payroll Obligations as of the Petition Date or a failure by the Debtors to continue their practices, programs and policies with respect to Employee benefits could severely disrupt the Debtors' relationship with its Employees, impair Employee morale at this critical juncture, and disrupt the Debtors' business operations. I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estate, its creditors and all other parties in interest and will enable the Debtors to continue to operate their business in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

**3.      Debtors' Motion for an Order Pursuant to 11 U.S.C.  §§  105(a),  363(c), 345(b), 1107 and 1108 (I) Authorizing the Debtor To Continue  and Maintain Its Existing Cash Management System, Bank Accounts and Business Forms, (II) Partially Modifying the Investment Guidelines Set Forth in 11 U.S.C. § 345, (III) Providing the United States Trustee With a 60-Day Objection <u>Period and (IV) Granting Related Relief (the "Cash Management Motion")</u>**

70.    The Debtors currently maintain an operating account at Freedom Bank and also maintain an account with Comerica.  Prior to the Comerica sweeps, all revenue was deposited in the Freedom account, and was periodically swept into the Comerica account from which business expenses were paid, including payroll.  Subsequent to the sweeps, all deposits have been made into, and expenses paid from the Freedom Account.

71.    I understand that under the Operating Guidelines for Chapter 11 Cases established by the United States Trustee's Office provide that the Debtors are required to close all existing bank accounts and open new accounts with the designation of "Debtor-in-Possession," (the "DIP Accounts").    One account is to be utilized for the payment of taxes and another for cash collateral.

72.    If the Debtors were required to close these existing accounts and open new ones, their ability to timely collect and disburse funds is likely to be at least temporarily disrupted, impaired and/or delayed, and create an unnecessary administrative burden.    Accordingly, the Debtors respectfully request that the Court enter an Order authorizing them to continue to use their existing bank accounts and cash management system (in their discretion), rather than opening new accounts, and to continue to use their existing business forms, until those supplies are exhausted.

73.    Requiring the Debtors to maintain an additional account for the purpose of taxes would be an unnecessary administrative burden and cost.

74.    Accordingly, the Debtors request that the Court enter the Deposit Account Motion.

**K.**    **Motion for Extension of Time to File Schedules and Statements**

75.    By its Motion for Entry of an Order to Extend Time to File (i) Schedules of Assets and Liabilities and Income and Expenses, (ii) Statement of Financial Affairs, and (iii) Schedule of Executory Contracts and Unexpired Leases (the "Motion to Extend Time"), the Debtors seek entry of an order, pursuant to Bankruptcy Rule 1007, extending the time within which the Debtors must file their schedules of assets and liabilities, current income and expenses, statements of financial affairs, and schedules of executory contracts and unexpired leases (collectively, the "Schedules and Statements"), as required by §521 of the Bankruptcy Code,

through and including May 20, 2013, a date which is approximately thirty (30) days after the Petition Date.

76.    The Debtors' management and employees, together with their outside legal counsel and accountants are working diligently to compile the information necessary for the Schedules and Statements.  The magnitude of that task, when taken together with the considerable stresses of preparing for the filing of this Chapter 11 case, the anticipated burdens relating to the Debtors' transition into Chapter 11, the limited staffing that the Debtors are currently working with, and ongoing burdens of operating the Debtors' business day-to-day, supports and extension of the 14 day deadline set forth in the Bankruptcy Rules for filing the Schedules and Statement, without prejudice to the right to seek further extensions.

77.    The relief requested in the Motion to Extend Time will not prejudice or adversely affect the rights of the Debtors' creditors or other parties-in-interest.  The extension requested by the Motion to Extend Time will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statement, which in turn will promote efficient administration of this Chapter 11 case.

**L.**    **Motion for Joint Administration of Cases**

78.    The Debtors respectfully request that their cases be jointly administered pursuant to *Fed.R.Bankr.P.* 1015(b), with Eagle Recycling as the lead case.  As is set forth above, Lieze is a wholly-owned subsidiary of Eagle Recycling, and is therefore an affiliate of Eagle Recycling.

79.    Further, the operations and financial reporting of Eagle Recycling and Lieze are combined so that all financial statements and tax returns of the Debtors are prepared and/or filed on a consolidated or joint basis.

80.    Joint administration of these cases is therefore necessary and appropriate, and will

result in a more efficient and economical administration of these Chapter 11 cases than if they were separately administered.

81.    Additionally, it is anticipated that a motion to transfer venue of the related Chapter 11 proceeding of MFLP from the Bankruptcy Court for the Southern District of Florida to this Court will be filed shortly in that case.  If that motion is granted, and venue of that case is transferred to this District, the Debtors anticipate that they will request the MFLP case also be jointly administered with these cases for similar reasons.

## **CONCLUSION**

82.    In sum, as a result of my first-hand experience, and through my review of various materials and information, discussions with the Debtors' employees and professionals, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in each of the First-Day Motions, (b) the need for the Debtor to transition into Chapter 11 smoothly, and (c) the deleterious effects upon the Debtor of not obtaining such relief.

83.    I believe the relief sought in each of the First-Day Motions will minimize the adverse effects of this Chapter 11 case on the Debtor and result in maximum creditor recoveries. I also believe that the relief is necessary to enable the Debtor to operate effectively in Chapter 11 as a debtor-in-possession.

84.    Accordingly, for the reasons stated herein and in each of the First-Day Motions, I respectfully request that each of the First-Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I hereby declare under penalty of perjury that the foregoing statements made by me are true and correct, to the best of my knowledge, information and belief.

Jeffrey Marangi

Dated: April 19, 2013

{00771819.DOC}